# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 23-00115-W-CR-RK |
| PATRICK SCOT WITCHER, | |
| Defendant. | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

**1. The Parties.** The United States of America, by and through the United States Attorney's Office for the Western District of Missouri, the Department of Justice, Criminal Tax Division, and the Department of Justice, Money Laundering and Asset Recovery Section (collectively, the "Offices"), and the defendant, Patrick Scot Witcher ("the defendant"), represented by Attorney Christopher Angles.

The defendant understands and agrees that this plea agreement is only between him and the Offices, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

**2. Defendant's Guilty Plea.** The defendant agrees to and hereby does plead guilty to Count One of the information charging him with a violation of 26 U.S.C. § 7206(1), that is, filing a false federal income tax return. A copy of the information is attached as Exhibit A. By entering into this plea agreement, the defendant admits that he knowingly committed this offense, and is in fact guilty of this offense.

**3. Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offense to which the defendant is pleading guilty are as follows:

> Defendant PATRICK SCOT WITCHER ("WITCHER") admits that he has assisted in the establishment, operation, and management of various Kansas City-based payday lending enterprises owned, at various times, by Joel Tucker, INDIVIDUAL-1, and INDIVIDUAL-2.
>
> WITCHER admits that he was co-owner, with one other individual, of BLUE AND WHITE, LLC, a Missouri limited liability company formed and organized with the Missouri Secretary of State on August 29, 2011. BLUE AND WHITE, LLC was formed and organized, by ATTORNEY-2, who also served as this limited liability company's manager. WITCHER admits that ATTORNEY-2 was the in-house lawyer and manager for various entities owned by INDIVIDUAL-1. WITCHER admits that this company was formed, in part, to ostensibly provide administrative services for a payday lending enterprise operated, directed, and controlled by INDIVIDUAL-2. WITCHER further admits that INDIVIDUAL-2's payday lending enterprise initially utilized an "offshore" model, whereby the operations purportedly occurred outside of the United States of America, while in reality the vast majority of the operations, administrative services, debt collection, and financing actually occurred in, and emanated out of, various locations in the United States and, more specifically, the Kansas City metropolitan area.
>
> WITCHER further admits that he was a co-owner and co-manager, with one other individual, of PURE WATER, LLC, a Missouri limited liability company formed and organized by ATTORNEY-2 with the Missouri Secretary of State on August 29, 2011. On that same date, PURE WATER, LLC formed EWF GROUP, LLC as a limited liability company formed and organized with the Delaware Department of State. WITCHER further admits that he signed the operating agreement for EWF GROUP, LLC as a co-manager of PURE WATER, LLC. WITCHER further admits that EWF GROUP, LLC formed LIQUID VENTURES, LLC as a limited liability company formed and organized under the laws of St. Kitts and Nevis.
>
> WITCHER further admits that LIQUID VENTURES, LLC was formed as an offshore lending portfolio to aid and assist the payday lending enterprise operated by INDIVIDUAL-2 and others.
>
> WITCHER further admits that LIQUID VENTURES, LLC, took on investors to provide capital to issue payday loans as part of this payday lending portfolio, including large investments by INDIVIDUAL-3 and INDIVIDUAL-4. WITCHER admits that in 2013 INDIVIDUAL-2 informed WITCHER, INDIVIDUAL-3, and INDIVIDUAL-4, that they were transitioning from the "offshore" lending model to the "tribal" lending model, and then began seeking out potential Native American tribes to work with in their payday lending enterprise. WITCHER admits that the

"tribal" lending model operated substantially similar to the "offshore" model, whereby the operations purportedly occurred on Native American reservations but in reality the vast majority of the operational, financial, and administrative functions of INDIVIDUAL-2's payday lending enterprise were in fact based at various locations in the Kansas City metropolitan area at all times. By late 2013, WITCHER admits that INDIVIDUAL-4 had begun taking on more of the managerial, financial, and administrative duties of LIQUID VENTURES, LLC.

WITCHER further admits that on August 16, 2013, a local bank elected to terminate its relationship with LIQUID VENTURES, LLC due to LIQUID VENTURES, LLC's payday lending business. As a result, WITCHER, WITCHER's co-owner with BLUE AND WHITE, LLC, INDIVIDUAL-2, INDIVIDUAL-3, and INDIVIDUAL-4 needed a new financial institution that was willing to enter into a banking relationship with a payday lending client notwithstanding the increased regulatory scrutiny and risk to a financial institution that this customer relationship involved. On August 20, 2013, INDIVIDUAL-4 and INDIVIDUAL-2 had a meeting with BANK OFFICIAL-1, an officer of BANK-1, a local banking institution chartered in the Western District of Missouri.

WITCHER admits that at or around this same time, INDIVIDUAL-2 and INDIVIDUAL-4 began discussing the transition of their "offshore" payday lending model to a "tribal" payday lending model, and began negotiating with a Native American tribe based in California to convert their payday lending operations to TRIBAL LENDING ENTITY-1, a tribal entity formed by the California-based Native American tribe.

WITCHER admits that on August 27, 2013, BANK OFFICIAL-1 emailed WITCHER, INDIVIDUAL-2, INDIVIDUAL-3, and INDIVIDUAL-4, advising them that BANK-1's board and BANK-1's owner expressed an interest in providing banking services to clients in the "short term consumer lending industry," and forwarding an article which reflected litigation between Native American tribes and the New York Department of Financial Services over internet payday lending businesses. WITCHER admits that on September 3, 2013, he provided BANK OFFICIAL-1 with the requested opening documents to create a bank account for LIQUID VENTURES, LLC, which would "be used strictly during the transition period" over to the TRIBAL LENDING ENTITY-1.

WITCHER further admits that on September 17, 2013, INDIVIDUAL-4 emailed BANK OFFICIAL-1, advising that he would "come out this week and open the following company" named RTR SOLUTIONS, LLC, advising that WITCHER, INDIVIDUAL-3, and INDIVIDUAL-4 would be signers on this account. WITCHER further admits that RTR SOLUTIONS, LLC was a Missouri limited liability company formed and organized with the Missouri Secretary of State on September 6, 2013, by ATTORNEY-1, a named shareholder of LAW FIRM-1.

3

WITCHER further admits that he, WITCHER's co-owner in BLUE AND WHITE, LLC, INDIVIDUAL-2, INDIVIDUAL-3, and INDIVIDUAL-4 agreed that LIQUID VENTURES, LLC would transition its ownership and investment in its payday lending portfolio into RTR SOLUTIONS, LLC as part of the enterprise's transition from the "offshore" lending model to the "tribal" lending model.

WITCHER further admits that on October 9, 2013, INDIVIDUAL-4, acting as an owner and member of RTR SOLUTIONS, LLC, entered into a Master Participation Agreement with TRIBAL LENDING ENTITY-1.

On October 10, 2013, INDIVIDUAL-4 emailed a BANK-1 official, advising that LIQUID VENTURES, LLC "will be phased out by the end of November."

WITCHER further admits that in August 2014 he, WITCHER's co-owner in BLUE AND WHITE, LLC, INDIVIDUAL-2, INDIVIDUAL-3, and INDIVIDUAL-4 formally executed their agreement to sell their combined interest in one of INDIVIDUAL-2's lending portfolios to TRIBAL LENDING ENTITY-1. The parties to these agreements – BLUE AND WHITE, LLC and two companies owned respectively by INDIVIDUAL-3 and INDIVIDUAL-4 – contracted to receive payments over the next 8 years totaling $11,800,000 as part of the sale of INDIVIDUAL-2's payday lending portfolio. WITCHER admits that the only parties to the Secured Promissory Note, Security Agreement, and Agreement and Plan of Merger were BLUE AND WHITE, LLC, RTR SOLUTIONS, LLC, and two companies owned respective by INDIVIDUAL-3 and INDIVIDUAL-4. WITCHER admits that INDIVIDUAL-2 was not a party to these written agreements; nor were any of INDIVIDUAL-2's companies parties to these written agreements. However, WITCHER, WITCHER's co-owner in BLUE AND WHITE, LLC, INDIVIDUAL-3, and INDIVIDUAL-4 all agreed to pay a commission fee of 25% of their earnings/revenue to a holding company owned by INDIVIDUAL-2 as a reflection of his role as originator and servicer of this payday lending portfolio.

WITCHER admits that an escrow agreement was entered into where the Note Holders – RTR SOLUTIONS, LLC, BLUE AND WHITE, LLC, and the two companies owned respectively by INDIVIDUAL-3 and INDIVIDUAL-4 – agreed to pay said 25% commission fee to INDIVIDUAL-2. ATTORNEY-1 served as escrow agent for receiving these incoming payments and disbursing these payments in concert with INDIVIDUAL-4 between August 2014 (when the agreements were first executed) and November 2018 (when the outstanding balance on the promissory note was paid in full.)

WITCHER further admits that RTR SOLUTIONS, LLC was managed principally by INDIVIDUAL-4, who continually reviewed the detailed finances of this company and advised the fellow owners of their anticipated payments over time, and that this continued through 2018.

4

WITCHER admits that he learned at some time in 2018 that INDIVIDUAL-3, INDIVIDUAL-4, and various companies owned and controlled by INDIVIDUAL-3 and INDIVIDUAL-4, were named defendants in a civil enforcement action brought by the Federal Trade Commission relating to their sweepstakes business.

WITCHER further admits that, at some time after April 10, 2018, he was contacted by INDIVIDUAL-3. INDIVIDUAL-3 advised WITCHER that he was upset with various rulings by the United States District Court Judge presiding over the case, that the case may negatively impact him financially, and was concerned that this judge would issue more severe rulings against him. INDIVIDUAL-3 asked WITCHER (who INDIVIDUAL-3 knew to be a former federal law enforcement officer) if WITCHER knew this judge or anyone else in the courthouse. WITCHER denied knowing the federal judge presiding over the case, and perceived INDIVIDUAL-3's inquiry as an attempt to use WITCHER to gain some relief from future adverse rulings by this judge.

WITCHER further admits that ATTORNEY-1 continued to disburse these installment sale payments from TRIBAL LENDING ENTITY-1 throughout 2018, and that he, WITCHER's co-owner in BLUE AND WHITE, LLC, INDIVIDUAL-2, INDIVIDUAL-3, and INDIVIDUAL-4 received their final payments from ATTORNEY-1 on this promissory note in mid-November 2018.

WITCHER further admits that the layering of these various corporate entities which received payments from ATTORNEY-1 in part through bank accounts maintained at BANK-1 and elsewhere on behalf of LAW FIRM-1 was done in part to disguise the nature, location, source, ownership, or control of the proceeds of INDIVIDUAL-2's payday lending enterprise.

WITCHER further admits that he contacted ATTORNEY-2 on October 23, 2018, seeking assistance in securing records of these installment sale payments to prepare amendments to his federal and state income taxes. WITCHER admits that he had multiple communications with ATTORNEY-2 verbally and in writing in an attempt to secure records relating to these installment sale payments received from ATTORNEY-1. WITCHER later learned that on October 23, 2018, ATTORNEY-1 advised ATTORNEY-2 that he did not have such records. WITCHER admits that on February 5, 2019, ATTORNEY-2 sent an email to WITCHER, which read, "Here is all that [ATTORNEY-1] sent me – which is just the Note…Sorry I wasn't able to help in time."

WITCHER admits that his unreported income and tax loss for tax years 2016 through 2018 is as follows:

| Tax Year | Unreported RTR SOLUTIONS, LLC Installment Sale Income | Tax Loss |
|---|---|---|
| 2016 | $410,088 | $99,854 |
| 2017 | $32,366 | $7,703 |
| 2018 | $750,902 | $191,472 |
|  | $1,193,356 | $299,029 |

Defendant further admits that on or about October 29, 2019, in the Western District of Missouri and elsewhere, he did willfully make and subscribe a Form 1040, U.S. Individual Income Tax Return for the calendar year 2018, which contained a written declaration that it was made under the penalties of perjury and which WITCHER did not believe to be true and correct as to every material matter, to wit, WITCHER filed a materially false Form 1040, U.S. Individual Income Tax Return for calendar year 2018, with the Internal Revenue Service, signed under the penalty of perjury, on which he omitted the installment income from the sale of a payday lending enterprise relative to his investment and ownership in RTR SOLUTIONS, LLC, all in violation of Title 26, United States Code, Section 7206(1). The tax harm caused by the defendant, WITCHER, for taking these false deductions for tax years 2016 through 2018 amounts to approximately $299,029. Defendant further admits he waives any challenge to venue and agrees that this case can be brought in the Western District of Missouri.

**4. Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands, and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2).

**5. Statutory Penalties.** The defendant understands that upon his plea of guilty to Count One of the Information charging him with filing a materially false federal income tax return, the maximum penalty the Court may impose is three years imprisonment, a $100,000 fine, not more than one year of supervised release, an order of restitution, and a $100 mandatory special assessment per felony count of conviction which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class E felony.

6

6. **Sentencing Procedures.** The defendant acknowledges, understands, and agrees to the following:

  a. in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

  b. the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

  c. in addition to any sentence of imprisonment, the Court may impose a term of supervised release of up to one year; and that the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

  d. if the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to one year pursuant to 18 U.S.C. § 3583(e)(3) without credit for time previously spent on supervised release. In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed one year pursuant to 18 U.S.C. § 3583(h), less the term of imprisonment imposed upon revocation of the defendant's first supervised release;

  e. the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

  f. any sentence of imprisonment imposed by the Court will not allow for parole;

  g. the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

  h. the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

  i. The defendant agrees that the United States may institute civil, judicial or administrative forfeiture proceedings against all forfeitable assets in which the defendant has an interest, and that he will not contest any such forfeiture proceedings.

j. Within 10 days of the execution of this plea agreement, at the request of the Offices, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility.

7. **Government's Agreements.** Based upon evidence in its possession at this time, the Offices, as part of this plea agreement, agree not to bring any additional charges against defendant for any federal criminal offenses related to wire fraud, wire fraud conspiracy, or money laundering for which it has venue and which arose out of the defendant's conduct described above.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the Offices have no knowledge.

The defendant recognizes that the Offices' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

8

8. **Preparation of Presentence Report.** The defendant understands the Offices will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character, and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he has pleaded guilty. The Offices may respond to comments made or positions taken by the defendant or the defendant's counsel and to correct any misstatements or inaccuracies. The Offices further reserve its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The Offices and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his plea of guilty only if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

10. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

9

a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

b. The applicable Guidelines Manual is the one that took effect on November 1, 2016;

c. The applicable Guidelines section for the offense of conviction is U.S.S.G. § 2T1.1 via the tax loss table via 2T4.1, which provides for a base offense level of 18. The parties agree that the total tax loss attributable to the defendant's conduct is $299,029, which is more than $250,000 but less than $549,000;

d. Because the perpetration of this offense involved the hiding assets or transactions through the use of corporate shells or offshore financial accounts established by ATTORNEY-1 and ATTORNEY-2, a 2-level enhancement for sophisticated means under U.S.S.G. §2T1.4(b)(2) applies. The parties may argue any other applicable enhancement or reduction;

e. The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, he is entitled to a three-level reduction pursuant to § 3E1.1(b) of the Sentencing Guidelines. The Government, at the time of sentencing, will file a written motion with the Court to that effect, unless the defendant (1) fails to abide by all of the terms and conditions of this plea agreement and his pretrial release; or (2) attempts to withdraw his guilty plea[s], violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility;

f. There is no agreement between the parties regarding the defendant's criminal history category. The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

g. The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does not bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

h. The United States agrees not to seek an upward departure from the Guidelines or a sentence outside the Guidelines range. The agreement by the United

10

States to not seek a departure from the Guidelines is not binding upon the Court or the United States Probation Office and the Court may impose any sentence authorized by law, including any sentence outside the applicable Guidelines range that is not "unreasonable";

i. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed and waives any right to have those facts alleged in the indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay; and

j. The defendant understands and agrees that the factual admissions contained in Paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed-upon Guidelines calculations contained in this agreement.

11. **Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge, and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

12. **Change in Guidelines Prior to Sentencing.** The defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

11

13. **Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

    a. oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

    b. comment on the evidence supporting the charge in the information;

    c. oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

    d. oppose any post-conviction motions for reduction of sentence, or other relief.

14. **Waiver of Constitutional Rights.** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

    a. the right to plead not guilty and to persist in a plea of not guilty;

    b. the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

    c. the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

    d. the right to confront and cross-examine the witnesses who testify against him;

    e. the right to compel or subpoena witnesses to appear on his behalf; and

    f. the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that if he pleads guilty, the Court may ask him questions about the offense or offenses to which he pleaded guilty, and if the defendant

12

answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

**15. Waiver of Appellate and Post-Conviction Rights.**

    a. The defendant acknowledges, understands, and agrees that by pleading guilty pursuant to this plea agreement he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct.

    b. The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

**16. Restitution.** Defendant agrees to pay restitution to the Internal Revenue Service in the total amount of $372,956, pursuant to 18 U.S.C. § 3663(a)(3).

    a. Defendant agrees that the total amount of restitution reflected in this agreement results from defendant's fraudulent conduct.

    b. The total amount of restitution consists of the following:

| Tax Year | Amount to be Credited to Tax | Interest Under Title 26 Due Through June 30, 2023[1] |
|---|---|---|
|  |  |  |

---

[1] This interest figure has been calculated by the IRS, under 26 U.S.C. §§ 6601 and/or 6621, as estimated for the date of sentencing. This interest figure does not include any interest that may accrue under 18 U.S.C. § 3612.

13

| 2016 | $99,854.00 | $32,361.12 |
| 2017 | $7,703.00 | $2,092.50 |
| 2018 | $191.472.00 | $39,473.38 |

    c. Defendant agrees to pay restitution by making an immediate payment in full on or before the date set for sentencing.

    d. Defendant agrees that he will sign any IRS forms deemed necessary by the IRS to enable the IRS to make an immediate assessment of that portion of the tax and interest that he agrees to pay as restitution (see paragraph 16(b)). Defendant also agrees to sign IRS Form 8821, "Tax Information Authorization."

    e. Defendant agrees not to file any claim for refund of taxes or interest represented by any amount of restitution paid pursuant to this agreement.

    f. Defendant agrees that he is liable for the fraud penalty under 26 U.S.C. §§ 6663 or 6651(f) on the amount to be credited to tax set forth in paragraph 16(b). Defendant agrees to the immediate assessment of the fraud penalty on the amount to be credited to tax set forth in paragraph 16(b) and agrees that, in order to enable the IRS to make an immediate assessment of the fraud penalty, the IRS form he agreed to sign in paragraph 16(d) will include the appropriate amount of the fraud penalty. Defendant agrees not to challenge or dispute any fraud penalties on the amount to be credited to tax set forth in paragraph 16(b).

    g. The parties understand that defendant will receive proper credit, consistent with paragraph 16(b) above, for the payments made pursuant to this agreement. Except as set forth in the previous sentence, nothing in this agreement shall limit the IRS in its lawful examination, determination, assessment, or collection of any taxes, penalties or interest due from the defendant for the time period(s) covered by this agreement or any other time period.

    h. Defendant agrees that this agreement, or any judgment, order, release, or satisfaction issued in connection with this agreement, will not satisfy, settle, or compromise the defendant's obligation to pay the balance of any remaining civil liabilities, including tax, additional tax, additions to tax, interest, and penalties, owed to the IRS for the time period(s) covered by this agreement or any other time period.

    i. Defendant understands that he is not entitled to credit with the IRS for any payment sent to an incorrect address or accompanied by incomplete or inaccurate information, unless and until any payment is actually received by the Internal Revenue Service and identified by it as pertaining to his particular liability.

j. Defendant agrees that, unless the Director of the Administrative Office of the United States Courts directs him otherwise, all payments made pursuant to the court's restitution order are to be sent only to the Clerk of the Court at the following address:

k. With each payment to the Clerk of the Court made pursuant to the District Court's restitution order, defendant will provide the following information:

1. Defendant's name and Social Security number;
2. The District Court docket number assigned to this case;
3. Tax year(s) or period(s) for which restitution has been ordered; and
4. A statement that the payment is being submitted pursuant to the District Court's restitution order.

Defendant agrees to include a request that the Clerk of the Court send the information, along with defendant's payments, to the appropriate office of the Internal Revenue Service.

l. Defendant also agrees to send a notice of any payments made pursuant to this agreement, including the information listed in the previous paragraph, to the IRS at the following address:

> IRS - RACS
> Attn: Mail Stop 6261, Restitution
> 333 W. Pershing Ave.
> Kansas City, MO 64108

17. **Financial Obligations.** By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

a. The Offices may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

b. The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

c. Within 10 days of the execution of this plea agreement, at the request of the Offices, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed

15

financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the Offices make a recommendation to the Court regarding the defendant's acceptance of responsibility.

d. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution.

e. The defendant hereby authorizes the Office's to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

f. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of $100 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

g. The defendant certifies that he has made no transfer of assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future.

h. In the event the Offices learn of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the Offices opt to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

18. **Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive, or to authorize any third party to request or

16

receive, from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

**19. Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

**20. Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the Offices will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

**21. Defendant's Representations.** The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice, and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys, or any other party to induce him to enter his plea of guilty.

**22. No Undisclosed Terms.** The parties acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

23. **Standard of Interpretation.** The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings. The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

TERESA A. MOORE
United States Attorney

Dated: May 22, 2023

KATHLEEN D. MAHONEY, Assistant United States Attorney

Dated: May 22, 2023

PATRICK D. DALY, Assistant United States Attorney

Dated: May 22, 2023

MATTHEW N. SPARKS, Assistant United States Attorney

BRENT S. WIBLE
Chief, Money Laundering and Asset Recovery Section, U.S. Department of Justice

Dated: May 22, 2023

/s/ Chad M. Davis
CHAD M. DAVIS, Trial Attorney, Bank Integrity Unit Money Laundering and Asset Recovery Section, U.S. Department of Justice

I have consulted with my attorney and fully understand all of my rights with respect to the offense charged in the Information. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: 5/22/2023

PATRICK SCOT WITCHER, Defendant

19

I am Christopher Angles, the defendant Patrick Scot Witcher's attorney. I have fully explained to Mr. Witcher his rights with respect to the offense charged in the information. Further, I have reviewed with him the provisions of the Sentencing Guidelines which might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, Mr. Witcher's decision to enter into this plea agreement is an informed and voluntary one.

Dated: 5.22.23

_____
CHRISTOPHER ANGLES, Attorney for Defendant